1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

3

4    JOGLAR PAINTING, INC.,

5        Plaintiff,

6        v.                                    CIVIL NO. 04-1606 (RLA)

7    URECOATS INDUSTRIES, INC.
     et al.,

8        Defendants.

9

10   **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND
     DISMISSING CLAIMS ASSERTED AGAINST CODFENDANT**

11   **URECOAT INDUSTRIES, INC.**

12       Codefendant URECOATS INDUSTRIES, INC. ("U-INDUS.") has moved the

13   court to enter summary judgment on its behalf and to dismiss the

14   claims asserted against it claiming it never had any commercial

15   relationship with the plaintiff but rather, the allegations in the

16   complaint pertain to URECOATS MANUFACTURING, INC. ("U-MFG.") a

17   separate corporate entity.

18       Plaintiff opposed the request and submitted a cross-motion for

19   summary judgment asking the court to rule that both URECOATS entities

20   are principals to its distributor relationship.

21       The court having reviewed the arguments presented by the parties

22   as well as the evidence submitted hereby rules as follows.

23                              **BACKGROUND**

24       Plaintiff, JOGLAR PAINTING, INC. ("JOGLAR PAINTING"), instituted

25   this action against U-INDUS. and U-MFG. for illegal termination of a

26   distribution agreement under Law 75 of June 24, 1964, as amended, 10

**CIVIL NO. 04-1606 (RLA)** **Page 2**

P.R. Laws Ann. §§ 278-278d (1997) ("Law 75"). U-MFG. counter-claimed demanding payment of an alleged outstanding debt of $81,811.92.

According to the information on record, in May 2002 plaintiff was granted exclusive rights to sell a spray weatherproofing system via a BlueMax machine especially designed to apply a patented rubber sealant membrane. Plaintiff's initial efforts included procuring the contract to weatherproof various buildings at the Ft. Buchanan Army Base in Puerto Rico. Subsequently, in or about May 2003 JOGLAR ROOFING and the parent company of GLIDDEN PAINTS OF PUERTO RICO ("GLIDDEN") entered into an agreement whereby GLIDDEN would promote the use of URECOATS products to its commercial customers on the island.

According to movant, codefendants are separate and distinct corporate entities and plaintiff has never had a commercial relationship with U-INDUS. Further, it contends that the allegations in the complaint pertain to U-MFG. "which is the entity that is a party to the Sales Agreement that has provoked the Complaint in the present case." Memorandum of Law (docket No. 12) p.2.

### THE FACTS

The following facts are not in dispute.

1.   U-INDUS. is incorporated under the laws of Delaware.

2.   RSM TECHNOLOGIES, INC. (f/k/a U-MFG.) was incorporated under the laws of the State of Florida on June 20, 2001.

**CIVIL NO. 04-1606 (RLA)** **Page 3**

3.   Effective February 1, 2004 U-MFG. changed its name to RSM
     TECHNOLOGIES, a Florida Corporation.

4.   A Sales Agreement dated May 21, 2002 was executed by U-MFG.
     and JOGLAR PAINTING, INC. for a BlueMax machine and other
     items listed in an exhibit thereto for $64,000.00 and
     granting exclusive distribution rights.  Specifically, at
     Section Two ¶ 5 the contract provides:

>      Seller hereby grants to Buyer an
>      exclusive right to sell and distribute
>      RSM-100 and the BlueMax applicator to
>      the territory of Puerto Rico which is
>      reviewable on a yearly basis based
>      upon Buyer attaining mutually agreed
>      upon performance goals.

Plaintiff's Statement of Facts (docket No. 17) Exh. 6.

5.   U-INDUS. was not a party to the Sales Agreement.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for
ruling on summary judgment motions, in pertinent part provides that
they shall be granted "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as
a matter of law." Sands v. Ridefilm Corp., 212 F.2d 657, 660-61
(1st Cir. 2000); Barreto-Rivera v. Medina Vargas, 168 F.3d 42, 45
(1st Cir. 1999). The party seeking summary judgment must first
demonstrate the absence of a genuine issue of material fact in the

**CIVIL NO. 04-1606 (RLA)**                                        **Page 4**

record. <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306 (1st Cir. 1997).  A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. <u>Morris v. Gov't Dev. Bank of Puerto Rico</u>, 27 F.3d 746, 748 (1st Cir. 1999); <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 856, 841 (1st Cir. 1993) *cert. den.*, 511 U.S. 1018 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. <u>Morrissey v. Boston Five Cents Sav. Bank</u>, 54 F.3d 27, 31 (1st Cir. 1995).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1987); <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 94 (1st Cir. 2000); <u>Grant's Dairy v. Comm'r of Maine Dep't of Agric.</u>, 233 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". <u>López-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 412 (1st Cir. 2001); <u>Maldonado-Denis v. Castillo-Rodríquez</u>, 23 F.3d 576, 581 (1st Cir. 1994); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" <u>Poulis-Minott v. Smith</u>, 388 F.3d 354, 361 (1st Cir. 2004) (citing <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 36 (1st Cir.1995)).

CIVIL NO. 04-1606 (RLA)                                            **Page 5**

## LAW 75

Puerto Rico Distributorship Act, Law 75 of June 24, 1964, P.R. Laws Ann. tit. 10 §§ 278-278d (1997) ("Law 75") "governs the business relationship between principals and the locally appointed distributors/dealers for marketing their products.  The statute was initially enacted to avoid the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the principal's products and/or services".  Irvine v. Murad Skin Research Lab., Inc., 194 F.3d 313, 317 (1st Cir. 1999); Euromotion, Inc. v. BMW of N. Am., Inc., 136 F.3d 866, 870 (1st Cir. 1998); Borschow Hosp. and Med. Supplies, Inc. v. César Castillo, Inc., 96 F.3d 10, 14 (1st Cir. 1996); R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 51 (1st Cir. 1996).

In enacting Law 75 the legislators were concerned with the inequities inherent in a commercial relationship between parties of disparate economic strength.  Distributors had no meaningful leverage at the contractual stage and were impotent before manufacturers who displaced them after having successfully developed a market for their products.  A.M. Capen's Co., Inc. v. Am. Trading and Prod. Corp., 74 F.3d 317, 321 (1st Cir. 1996). The Puerto Rico Supreme Court has explicitly indicated that "Act No. 75 unquestionably represents a strong public policy directed to level[ing] the contractual conditions between two groups financially unequal in their strength." Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 820 (1st

1    **CIVIL NO. 04-1606 (RLA)**                                    **Page 6**

2

3    Cir. 1988) (emphasis ours) (response of Puerto Rico Supreme Court to

4    certified question concerning Law 75) A.M. Capen's Co., Inc. v. Am.

5    Trading and Prod. Corp., 202 F.3d 469, 474 (1st Cir. 2000); Capen's,

6    74 F.3d at 321.

7        Through the enactment of Law 75 Puerto Rico has sought to

8    safeguard local dealers from indiscriminate termination of their

9    services as soon as they had successfully developed a lucrative

10   business.  "The legislative history clearly focuses on the problems

11   faced by dealers in Puerto Rico who are terminated once they have

12   invested in and created a favorable market for a principal's

13   product."  Capen's, 202 F.3d at 474; Euromotion, 136 F.3d at 870.

14           The Commonwealth of Puerto Rico cannot remain
         indifferent to the growing number of cases in which
15       domestic and foreign enterprises, without just cause,
         eliminate their dealers ... as soon as these have created
16       a favorable market and without taking into account their
         legitimate concerns.
17           The Legislative Assembly of Puerto Rico declares that
         the reasonable stability in the dealer's relationship in
18       Puerto Rico is vital to the general economy of the country,
         to the public interest and to the general welfare....

19   Capen's, 202 F.3d at 474 (emphasis ours) (citing Roberco, Inc. v.

20   Oxford Indus., Inc., 122 D.P.R. 115, 121-22 (1988) (quoting from the

21   Statement of Motives, 1964 Laws of Puerto Rico 243-244).

22       In order to achieve this end, Law 75 has limited the principal's

23   ability to unilaterally end the relationship unless just cause is

24   present. The protection extends to those acts detrimental to the

25

26

**CIVIL NO. 04-1606 (RLA)** **Page 7**

distribution relationship.[1] Further, severe economic liability is imposed upon the principals for unjustified terminations of their relationship with the dealers.[2] *See*, <u>Irvine</u>, 194 F.3d at 317.

A "dealer" is defined in the statute as a "person... having effectively in his charge in Puerto Rico the distribution... or representation of a given merchandise or service" P.R. Laws Ann. tit. 10, § 278(a) (1997) whereas a "dealer's contract" is defined as a "relationship established between a dealer and a principal... whereby and irrespective of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of merchandise... on the market of Puerto Rico." § 278(b).

Thus, there is no need for a written contract between the parties to trigger the application of Law 75 protection nor is a particular duration of the relationship required. "The statute clearly incorporates within its reach *any* arrangement between a supplier and dealer in which the dealer is actually in the process of distributing the supplier's merchandise in Puerto Rico... [and] once that relationship is established, the statute applies irrespective of

---

[1] The statute provides, in relevant part, that "[n]otwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." § 278a.

[2] *See*, § 278b for factors to take into consideration in computing the award.

**CIVIL NO. 04-1606 (RLA)**                                        **Page 8**

the length of time such an arrangement has been in existence... [I]t cannot be said that a relationship is established within the meaning of Law 75 only if it is committed to writing". Welch, 13 F.3d at 482-83 (italics in original). *See*, Madelux Int'l v. Barama Co., Ltd., 364 F.Supp.2d 68, 74 (D.P.R. 2005) (internal quotation marks and citations omitted) ("lack of formal agreement... not a legal obstacle... to the protective cloak of Law 75.") *See also*, Homemedical Inc. v. Sarns/3M Health Care, Inc., 875 F.Supp. 947, 950 (D.P.R. 1995).

### PLAINTIFF'S RELATIONSHIP WITH U-INDUS.

Plaintiff contends that it was a distributor under Law 75 for both U-INDUS. and U-MFG. as principal parties to the relationship. It argues that regardless of the parent-subsidiary connection between codefendants at the time of the relevant facts both these entities established a principal-distributor relationship with JOGLAR PAINTING. Specifically, plaintiff charges that the two corporations dealt with it indistinctly in JOGLAR PAINTING's efforts to open a favorable local market as well as promoting and selling URECOATS products in Puerto Rico.

U-INDUS. on the other hand contends that its role was limited to pre-agreement negotiations which are not relevant to the Law 75 relationship. Additionally, it submitted voluminous evidence in support of its argument of its corporate separateness with U-MFG.

**CIVIL NO. 04-1606 (RLA)**                                    **Page 9**

Plaintiff argues that it is not seeking to rip the corporate veil between the two defendant entities as movant contends. Rather, it is plaintiff's position that both U-INDUS. and U-MFG. were active participants in the relationship in that each of them engaged in overt acts directed at the establishment, maintenance and furtherance of the commercial relationship geared at the development of a local market for the URECOATS products.

In order to rule on the issue currently before us, we shall examine the evidence on record[3] reflecting those contacts between plaintiff and U-INDUS. which may support an inference of a distribution relationship existing between them for approximately the 15 months[4] that it lasted.

According to the record, NEVILLE BURDE, Director of International Sales Marketing of U-INDUS.,[5] dealt directly with MR. JOGLAR in all steps leading to the Purchase and Sale Agreement of a BlueMax machine and other products for $64,000.00 in May 2002 which

---

[3] The facts included in the documents and the materials attached to a motion for summary judgment, as well as to the opposition papers, must be admissible in evidence. Horta v. Sullivan, 4 F.3d 2, 7-8 (1st Cir. 1993). Thus, we shall disregard the newspaper articles submitted by plaintiff herein.

[4] The agreement was signed in May 2002 and the termination letter was dated October 29, 2003.

[5] Petitioner submitted a September 23, 2002 letter appointing MR. BURDE to the position of International Sales and Marketing Director for U-MFG. Opposition by U-INDUS. (docket No. 26, Exh. 23). However, this appointment is subsequent to the initial steps taken by MR. BURDE into the relationship, commencing at least by February 2002.

CIVIL NO. 04-1606 (RLA)                                          **Page 10**

contract included the distribution clause. In this vein, there is a

February 27, 2002 letter addressed to plaintiff and signed by MR.

BURDE, promoting its products. MR. BURDE concluded the correspondence

by stating "[h]oping this can be the start to (sic) a prosperous and

exciting new future business venture for both parties."[6]   There is

also a February 28, 2002 fax cover sheet from MR. BURDE to plaintiff

transmitting a price sheet;[7] a March 25, 2002 price proposal for

BlueMax equipment addressed to MR. BURDE from JOGLAR ROOFING, INC.

signed by EDUARDO R. JOGLAR,[8] and an April 8, 2002 reply to the Blue

Max proposal from MR. BURDE sent to JOGLAR ROOFING, INC.[9] On April 19,

2002 MATTHEW R. SIMRING, ESQ., Corporate Attorney, sent a letter to

JOGLAR PAINTING on U-INDUS. letterhead[10] discussing the arrangements

---

[6]   Plaintiff's Statement of Facts (docket No. 17) Exh. 1.

[7]   *Id.* Exh. 2.

[8]   *Id.* Exh. 3.

[9]   *Id.* Exh. 4. Petitioner spurns correspondence with JOGLAR ROOFING, INC. as irrelevant to the issue before us claiming that the written sales contract, *ergo*, the business relationship, was entered into exclusively with plaintiff, JOGLAR PAINTING. However, as plaintiff explained, JOGLAR ROOFING was its wholly-owned subsidiary acting in support of the distribution efforts and was responsible for the actual application of the product for roofing and waterproofing. On the other hand, JOGLAR PAINTING was the entity certified as a U.S. Government contractor, procured federal contract awards and was certified by U-INDUS. as an applicator for its roofing materials. Reply (docket No. 32) p.2 ¶¶ 8 & 10.

[10]   Counsel was also the signatory to the October 29, 2003 termination notice of the Sales Agreement this time as General Counsel for U-MFG. Plaintiff's Statement of Facts (docket No. 17) Exh. 20.

**CIVIL NO. 04-1606 (RLA)**                                        **Page 11**

---

for plaintiff to purchase a BlueMax machine "and to do demonstrations and sample roofs [in Puerto Rico] at our cost for the material." The letter also "outlined our mutual obligations."[11] On April 30, 2002 JOSE L. UBIÑAS, Project Manager for JOGLAR ROOFING, INC., sent a letter to MR. BURDE transmitting a check for $7,000.00 as deposit for the BlueMax machine.[12]

The Sales Agreement containing distribution rights was executed on May 21, 2002 by U-MFG. and JOGLAR PAINTING, INC. and there is sparse interchange between plaintiff and U-INDUS. subsequent to this date.

MR. BURDE faxed MRS. JOGLAR on June 11, 2002 regarding pricing and discount prices.[13]

Thereafter, on November 11, 2002 EDUARDO JOGLAR/JOGLAR ROOFING sent a letter to DALE EPPERSON, of U-INDUS., following up on their previous conversation of October 31, 2002 whereby U-INDUS. "agreed to assume all expenses of Joglar Painting and Roofing, for the problems caused by the merchandise that arrived on October 11, 2002." The letter further noted that "Urecoats Industries, Inc., must call and confirm the date, carrier, and other pertinent information such as the quantity of merchandise that will be sent."[14]

---

[11]   Plaintiff's Statement of Facts (docket No. 17) Exh. 5.

[12]   *Id*. Exh. 6.

[13]   *Id*. Exh. 7.

[14]   *Id*. Exh. 14.

**CIVIL NO. 04-1606 (RLA)** **Page 12**

Even taking the November 7, 2002 letter generated by plaintiff into consideration, we find these two post-contract contacts insufficient to form a relationship under Law 75.

Further, the other events pointed out by plaintiff in support of its arguments are not pertinent to this issue. Plaintiff submitted a June 7, 2002 Vendor Demonstration Agreement whereby U-INDUS. was authorized to demonstrate its resurfacing product at Ft. Buchanan, Puerto Rico[15] and a copy of a Program for a URECOATS on site spray demonstration including a 30 minute presentation by TIM KARDOK, CEO and President of U-INDUS.[16]

The fact that a local demonstration of the product was carried out by U-INDUS. does not necessarily denote a direct relationship between the parent company and plaintiff herein.

Similarly, we find irrelevant the fact that U-INDUS. issued a confirmation on October 7, 2002 certifying that JOGLAR PAINTING personnel who had attended a training course at their facilities in Florida had been successfully certified on completion.[17]

On January 16, 2003 ALLYSON TOMCHIN of U-MFG. transmitted a fax to JOSE UBIÑAS attaching a sample reference letter to be addressed to TIMOTHY KARDOK, CEO and President of U-INDUS. expressing its satisfaction with the URECOATS products and the support provided. A

---

[15]  Plaintiff's Statement of Facts (docket No. 17) Exh. 8.

[16]  *Id*. Exh. 29.

[17]  *Id*. Exh. 12.

**CIVIL NO. 04-1606 (RLA)** **Page 13**

letter ensued on January 27, 2003 from JOGLAR ROOFING, INC. subscribed by EDUARDO JOGLAR essentially replicating the proposed letter.[18]   There is no basis for concluding that the aforementioned request by U-MFG. for an endorsement letter for U-INDUS. is indicative of the direct relationship.

On the other hand, there is ample evidence of business dealings directly between plaintiff and URECOATS MFG. commencing as early as January 2002 addressing different aspects of their relationship including sales, billing, warranty as well as technical aspects of the product. These are:

1.    URECOATS MFG. Completed Project Inspection Report and warranty issued by URECOATS MFG. to JOGLAR PAINTING & ROOFING for work carried out from January 22 through 24, 2002[19] and the corresponding URECOATS MFG. Purchase Order Authorization for completed Project Inspection.[20] [deft. exh. 7]

2.    January 28, 2003 letter to EDUARDO JOGLAR from TODD C. ANDERSEN, Sales Manager for U-MFG. regarding a meeting at JOGLAR ROOFING pertaining to billing problems, Ft. Buchanan projects, and material testing.[21]

---

[18]   Plaintiff's Statement of Facts (docket No. 17) Exh. 15.

[19]   Opposition (docket No. 26) Exh. 6.

[20]   *Id*. Exh. 7.

[21]   Plaintiff's Statement of Facts (docket No. 17) Exh. 15.

**CIVIL NO. 04-1606 (RLA)**                                      **Page 14**

3.    January 28, 2001 Pre-Job Form for Ft. Buchanan project
      prepared by URECOATS MFG. Technical Support Group.[22]

4.    Report on material testing at JOGLAR and February 6, 2003
      visit by CHRISTINE CAJIAO.[23]

5.    Report on February 24-26, 2003 visit by EDUARDO JOGLAR and
      other persons from Puerto Rico to URECOATS facilities.
      According to the document the purpose of the visit was to
      clarify doubts regarding the materials, observe other
      contractor jobs, discuss warranty and other matters. The
      document is unsigned but appears in URECOATS MFG.
      letterhead.[24]

6.    May 5, 2003 report on visual inspection of Ft. Buchanan
      building for roofing project by URECOATS MFG.[25]

7.    March 10, 2003 letter from CHRISTINE CAJIAO, to EDUARDO
      JOGLAR/JOGLAR ROOFING INC. acknowledging a visit URECOATS's
      facilities and responding to questions raised at the time
      regarding technical matters the product and its
      application.[26]

---

[22]   Opposition (docket No. 26) Exh. 3.

[23]   *Id.* Exh. 5. According to a Personnel Action form submitted
by petitioner CHRISTINE CAJIAO was employed by URECOATS MFG.
commencing on May 21, 2002. *Id*. Exh. 26.

[24]   *Id*. Exh. 4.

[25]   *Id*. Exh. 8.

[26]   *Id.* Exh. 16.

**CIVIL NO. 04-1606 (RLA)**                                            **Page 15**

8.  May 21, 2002 BlueMax Sales Analysis addressed to JOGLAR PAINTING, INC. issued by URECOATS MFG.[27]

9.  July 16, 2003 letter to TODD ANDERSEN, Manager, Strategic Sales for URECOATS MFG., from LYDIANNE JOGLAR regarding warranty for work performed on Ft. Buchanan building.[28]

10. July 19, 2002 letter to JOSE UBIÑAS at JOGLAR ROOFING from DAVID E. DANA, Ph.D, Vice President Research and Development of URECOATS MFG. providing technical information on application of the product. [29]

11. July 29, 2003 Limited Material Warranty issued by URECOATS MFG. for roof repairs carried out by JOGLAR PAINTING, INC. at Ft. Buchanan building.[30]

12. Fax to MICHAEL ADAMS, URECOATS MFG. transmitting Agenda of Conference Call held on October 14, 2003 which included distribution and exclusivity agreements.[31] [dft. exh. 11]

13. December 18, 2002 letter to EDURADO JOGLAR/JOGLAR ROOFING, INC. from TODD C. ANDERSEN, Sales Manager for URECOATS MFG. addressing items of November 7, 2002 letter from MR. JOGLAR

---

[27]  Opposition (docket No. 26) Exh. 13.

[28]  *Id*. Exh. 10

[29]  Plaintiff's Statement of Facts (docket No. 17) Exh. 10.

[30]  Opposition (docket No. 26) Exh. 12.

[31]  *Id.* Exh. 11.

**CIVIL NO. 04-1606 (RLA)** **Page 16**

and discussing matters related to purchase of equipment and costs.[32]

14. Certificate of training in the use of BlueMax spray application system and UrecoatsRSM-100 weatherproofing system issued by URECOATS MFG. and signed by ARTHUR K. GUYTON PhD, SVP Marketing and FRANK BIEN, Senior Engineer.[33]

15. November 6, 2002 letter to EDUARDO JOGLAR from TODD C. ANDERSEN, Sales Manager for URECOATS MFG. following up on their conversation of that date regarding new construction specifications.[34]

16. October 6, 2003 fax cover sheet from URECOATS INDUS. from PATRICK MIGLIORE of U-MFG asking EDUARDO JOGLAR to call regarding an order for a Compressor and Generator.[35]

17. October 2003 fax from PATRICK MIGLIORE to EDUARDO JOGLAR advising he would be sending brochures, manuals, power point presentations, video discs and sample business cards for the first ICI Location in San Juan.[36]

In sum, as previously mentioned, even though U-INDUS. may have played an active role in the events leading to the execution of the

---

[32]   Opposition (docket No. 26) Exh. 15.

[33]   *Id*. Exh. 14.

[34]   Plaintiff's Statement of Facts (docket No. 17) Exh. 13.

[35]   *Id*. Exh. 18.

[36]   *Id*. Exh. 19.

**CIVIL NO. 04-1606 (RLA)**                                    **Page 17**

distribution agreement, the post May 2002 contacts do not support a finding of a relationship between the parent company and plaintiff herein. Rather, it is evident from the clear contract terms that it was U-MFG. which granted the distribution rights. Further, the evidence overwhelmingly establishes that U-MFG developed a continued relationship with plaintiff herein consonant with those distribution rights. Corporate entities may choose to exercise distribution rights to their products through subsidiary corporations. *See i.e.,* <u>B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.</u>, __F.3d __, 2006 WL 668730 (1st Cir. March, 17, 2006).

**CONCLUSION**

Based on the foregoing, the Motion for Summary Judgment filed by U-INDUS. (docket No. **11**) is **GRANTED** and the Cross-Motion for Summary Judgment filed by plaintiff (docket No. **16**) is **DENIED.**

Accordingly, the claims asserted against U-INDUS. are hereby **DISMISSED.** Judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 7th day of April, 2006.

S/Raymond L. Acosta
RAYMOND L. ACOSTA
United States District Judge